**AKB HENDRICK, LP, Appellant**

v.

**MUSGRAVE ENTERPRISES, INC.; Musgrave & Musgrave, LLP; and Kenneth L. Musgrave, Appellees.**

**No. 05–11–00251–CV.**

Court of Appeals of Texas, Dallas.

Aug. 22, 2012.

Lance Eric Caughfield, Stephen A. Khoury, Kelsoe, Anderson, Khoury, & Clark, L.L.C., Dallas, TX, for Appellant.

D. Ronald Reneker, Michael Craig Lee, David Jefrie Mizgala, Dallas, TX, for Appellees.

Before Justices FITZGERALD, MURPHY, and FILLMORE.

## OPINION

Opinion By Justice FILLMORE.

Appellant AKB Hendrick, LP appeals the summary judgment granted in favor of appellees Musgrave Enterprises, Inc., Musgrave & Musgrave, LLP, and Kenneth L. Musgrave. In its first issue, AKB asks this Court to determine whether the trial court implicitly granted or denied appellees' objections to AKB's summary judgment evidence. In its second issue, AKB asserts the trial court erred if it implicitly granted appellees' objections to AKB's summary judgment evidence. In its third, fourth, fifth, and sixth issues, respectively, AKB contends the trial court erred in granting summary judgment on its claims of fraud, breach of contract, tortious interference with contract, and negligent misrepresentation. We affirm the trial court's judgment.

## Factual Background

### The AKB/JP Morgan Contract

In 2007, Hendrick Ranch (the Ranch), real property spanning approximately 42,000 acres in west Texas, was held by JP Morgan Chase Bank, NA, as Trustee of the Hendrick Home for Children Trust (JP Morgan). On May 31, 2007, AKB Hendrick Limited Partnership (AKB) executed a contract with JP Morgan for purchase of the Ranch (the AKB/JP Morgan Contract).[1] In the AKB/JP Morgan Contract,

---

1. The contract was signed by Jay Paul Hamilton, a "member" of AKB Investments, LLC,

JP Morgan agreed that during the term of the contract, it would not market the Ranch or solicit or accept any backup offers to purchase the Ranch. The AKB/JP Morgan Contract permitted AKB up to ten months to raise the money to close the purchase of the Ranch, find other third party investors to fund the purchase of the Ranch, or withdraw from the contract.

The AKB/JP Morgan Contract required AKB to deposit $250,000 in escrow as initial earnest money. Because the AKB/JP Morgan Contract was still in effect sixty days after its execution, AKB was required to deposit an additional $250,000 in escrow as earnest money. The AKB/JP Morgan Contract provided for an initial inspection period to end on November 30, 2007, and three options to extend the inspection period by thirty days each, to a March 1, 2008 date for closing the sale. To exercise an option to extend the inspection period, AKB was to direct the title company to deduct and pay to JP Morgan $75,000 from the $500,000 earnest money deposit held in trust. Under the AKB/JP Morgan Contract, if AKB exercised its unrestricted right to terminate the contract at any time during the initial inspection period, AKB was entitled to a refund of its entire $500,000 earnest money deposit. However, for each optional extension of the inspection period that AKB exercised, the $75,000 extension fee deducted from the escrow account became nonrefundable and could not be used to pay any portion of the purchase price of the Ranch.

*The Hendrick Ranch Alternate Contract Agreement*

With the end of the initial inspection period under the AKB/JP Morgan Contract nearing, Jay Paul Hamilton, a "member" of AKB Investments, LLC, the general partner of AKB, approached Kenneth

L. Musgrave (K.L.M.) regarding purchasing the Ranch. In his deposition, K.L.M. testified that Hamilton called and told him that AKB had the Ranch under contract, and Hamilton wanted to talk to him about the AKB/JP Morgan Contract. Kenneth P. Musgrave (K.P.M.), the son of K.L.M. and Vice President of Musgrave Enterprises, Inc. and a partner of Musgrave & Musgrave, LLP, stated in his affidavit that "[i]n or about October 2007," AKB contacted the "Musgrave Entities" (Musgrave Enterprises, Inc. and Musgrave & Musgrave, Inc.) to inquire whether the Musgrave Entities would be interested in working with AKB to purchase the Ranch.

K.L.M. testified that he and K.P.M. informed Hamilton they were prepared to enter into an agreement with AKB whereby AKB would be paid to permit negotiation of a purchase of the Ranch despite the exclusivity provision of the AKB/JP Morgan Contract, provided AKB maintained its contract with JP Morgan. According to K.L.M., it was important that AKB maintain the AKB/JP Morgan Contract because it "locked in the price" for the Ranch.

K.L.M. planned to form a nonprofit entity, the Musgrave Foundation, as the entity that would purchase the Ranch. Hamilton expressed doubt to K.L.M. about the ability of a nonprofit foundation to purchase the Ranch. However, K.L.M. responded to Hamilton's concern by expressing his confidence in the ability of the Musgrave Foundation to purchase the Ranch "or [he] certainly wouldn't have been talking about it." Hamilton also expressed his concern about the short period of time AKB had to make a payment under the AKB/JP Morgan Contract to extend the initial inspection period ending November 30, 2007. In his affidavit, Hamilton stated that he expressed his concern to K.L.M. about the

the general partner of AKB, and Charles B. Wilson, Vice President, JP Morgan.

$75,000 per month fees to extend the inspection period under the AKB/JP Morgan contract and that K.L.M. stated he understood the cost of extending the AKB/JP Morgan Contract. According to Hamilton, K.L.M. said he "could 'help out' with those costs should they become an issue," and Hamilton should not worry about that.[2]

As a result of the negotiations between K.L.M., K.P.M., and Hamilton, an agreement was reached between AKB and Musgrave Enterprises, Inc., whereby an alternate offer of purchase of the Ranch by the Musgrave Foundation could be made to JP Morgan, despite the exclusivity provision of the AKB/JP Morgan Contract. The specific terms of the agreement were reduced to writing in the Hendrick Ranch Alternate Contract Agreement (the ACA), and the ACA was signed on November 21, 2007. The ACA was signed on behalf of AKB by Hamilton, a "member" of AKB Investments, LLC, the general partner of AKB, and on behalf of Musgrave Enterprises, Inc. by K.L.M., Managing Partner of Musgrave & Musgrave, LLP.

The ACA identifies the "Principals" to be AKB as "Buyer," JP Morgan as "Seller," and the Musgrave Foundation as "Alternate Buyer." It is undisputed that at the time the ACA was signed, AKB was aware the Musgrave Foundation was not yet a legal entity.[3] Nevertheless, the ACA expressly refers to an "alternate purchase contract" between the proposed Musgrave Foundation and JP Morgan:

> The purpose of this document is to outline in general terms the arrangement whereby [AKB] agrees to coordinate the presentation of an alternate purchase contract from the Musgrave Foundation for consideration by [JP Morgan] for the purchase of the [Ranch] . . . .

The ACA provides that AKB had requested the participation of Musgrave Enterprises, Inc. to facilitate the consummation of the purchase of the Ranch. As memorialized in the ACA, AKB and Musgrave Enterprises, Inc. agreed to the following "tasks" to accomplish that objective: on or before November 21, 2007, AKB would deliver a written request to JP Morgan to consider an alternate contract for purchase of the Ranch from the Musgrave Foundation; on or before November 26, 2007, after Musgrave Enterprises, Inc. had the opportunity to present the alternate contract for purchase of the Ranch by the Musgrave Foundation to JP Morgan, Musgrave & Musgrave, LLP would pay $25,000 to AKB as "good faith money"; and, on or before November 29, 2007, AKB would use its best efforts to secure an amendment to the AKB/JP Morgan Contract specifically limited to permitting JP Morgan to receive for consideration an alternate purchase contract from the Musgrave Foundation.

The ACA also provides that "[u]pon a fully executed alternate purchase contract," Musgrave & Musgrave, LLP, would pay $1,000,000 to AKB. To address AKB's concern that the ACA could be interpreted as impeding AKB's ability to find other potential investors until such time as JP Morgan executed an alternate purchase contract with the Musgrave Foundation, the ACA provides that until JP Morgan executed a contract with Musgrave Foun-

---

2. This factual summary presents disputed evidence in the light most favorable to AKB as nonmovant. *See Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985) (we consider evidence in summary judgment proceeding in the light most favorable to the nonmovants).

3. There is no provision in the ACA concerning the parties' rights and obligations in the event the Musgrave Foundation was never formed or was unable to purchase the Ranch.

dation for purchase of the Ranch and the $1,000,000 compensation was paid to AKB by "Musgrave or its affiliates," AKB was free to negotiate with and accept other offers from third parties "in an alternative arrangement." The ACA further provides:

> The existing [AKB/JP Morgan Contract] between [AKB] (Buyer) and [JP Morgan] (Seller) dated May 31, 2007 for the 42,000 (appx.) acres known as the [Ranch] shall remain in effect until said time that an alternate purchase contract has been executed between Seller and the Musgrave Foundation (Alternate Buyer). This agreement along with its conditions shall in no way be construed to have jeopardized the ability of [AKB] (Buyer) or [JP Morgan] (Seller) to perform under the current contract dated May 31, 2007.

(Emphasis in original).[4] K.P.M. indicated in his affidavit that AKB's obligation to maintain the AKB/JP Morgan Contract in effect until JP Morgan and the proposed Musgrave Foundation executed an alternate purchase contract was a material inducement for the Musgrave Entities agreeing to pay AKB $1,000,000 upon execution of the alternate purchase contract. According to K.P.M., the "restrictions provided by the AKB/JP Morgan Contract on JP Morgan's ability to market the Ranch to third parties, to accept offers from third parties, and to otherwise sell the Ranch to any third party (absent AKB's express consent)" limited the risk of third parties

entering into negotiations with JP Morgan and increasing the purchase price or causing JP Morgan to demand contract terms unfavorable to the proposed Musgrave Foundation.

The same day AKB signed the ACA, AKB hand delivered correspondence to JP Morgan, which requested that JP Morgan accept a new purchase contract for the Ranch from K.L.M. In that correspondence, AKB stated that "things have occurred beyond [AKB's] control, which seriously affects (sic) [AKB's] being able to consummate the [AKB/JP Morgan Contract] by March 1,2008."[5] In the letter, AKB advised JP Morgan that "it may be in everyone's best interest to consider a different program" and stated:

> We have been in contact with Mr. Kenneth L. Musgrave, who is a well known investor in ranch purchases and developments. Mr. Musgrave has made a proposal to us that would allow us to realize a fair return for our time and investment. If his offer is acceptable to the Hendrick Trust and Hendrick's Home for Children, the transaction can be completed immediately, instead of having to wait until March 1, 2008 to see if the present deal closes.

> Bottom line: Mr. Musgrave has agreed to pay us an agreed upon price to withdraw from the transaction. We respectively request the Hendrick Trust accept a new contract from Mr. Musgrave and, once accepted, return our escrow deposits. We understand his offer to be re-

---

4. In his affidavit, Hamilton stated it was never his understanding that this ACA language requiring that the AKB/JP Morgan Contract remain in effect until an alternate purchase contract has been executed imposed a duty on AKB to maintain the AKB/JP Morgan Contract by paying the inspection period extension fees of $75,000 each.

5. AKB noted that subprime loan "problems" had resulted in an adverse affect on the real estate industry; money for real estate transactions was no longer available; ranch property sales had slowed and list prices had been reduced; and, because of AKB's inability to procure "1/4 minerals," one of AKB's "prime investors" no longer wanted to be included in the purchase of the Ranch.

ceived by the Hendrick Trust will be comparable to our present contract. The main difference is that Mr. Musgrave's contract can close immediately upon acceptance, which would benefit the various parties in the overall operation.

On November 26, 2007, K.L.M. and K.P.M. met with Charles B. Wilson of JP Morgan to present the terms of a proposed alternate purchase contract whereby the Musgrave Foundation would purchase the Ranch from JP Morgan.[6] In a document K.L.M. supplied to JP Morgan concerning the proposal for the Musgrave Foundation to purchase the Ranch entitled "Limited Background Information Concerning Musgrave Foundation," the following is stated:

> AKB has now entered into an agreement with Musgrave Foundation whereby AKB is agreeing to accept a cash payment from Musgrave [sic], and request that [JP Morgan] consider accepting an alternate contract to sell the ranch to Musgrave Foundation. Should the trust decide it does not want to enter into a new purchase agreement with Musgrave Foundation, the present contract of

AKB, will still remain in effect until March 1, 2008. . . .

> The Trust enters into an agreement to sale [sic] the [Ranch] to Musgrave Foundation under the pricing structure as outlined above. Musgrave Foundation will act as the agent to develop and sale (sic) the [Ranch]. . . .

K.L.M. testified his plan was that the Musgrave Foundation would sell parcels of the Ranch property and reap the profit. No profits would have gone to Musgrave Enterprises, Inc. or Musgrave and Musgrave, LLP. According to K.L.M., because the Musgrave Foundation would be a nonprofit organization, it would pay no income taxes on the transactions. JP Morgan advised K.L.M. that it did not believe, as structured, this plan was feasible.[7] At that time, JP Morgan did not accept or reject the proposed alternate purchase contract whereby the Musgrave Foundation would purchase the Ranch.[8]

In accordance with the terms of the ACA, on November 26, 2007, a check was issued by Musgrave & Musgrave, LLP to AKB in the amount of $25,000 for AKB's

---

**6.** The record contains correspondence to JP Morgan from AKB dated November 28, 2007. In that letter, Hamilton, on behalf of "buyer" AKB under the AKB/JP Morgan Contract, thanked Wilson for taking the time to meet with K.L.M. and K.P.M. earlier that week. The letter contained an amendment to the AKB/JP Morgan Contract, signed by Hamilton on behalf of AKB providing:

> BUYER [AKB] and SELLER [JP Morgan] do hereby agree that SELLER shall be released from special provision 4 *Marketing the Property* found in EXHIBIT B in order to facilitate negotiations towards an alternative purchase agreement with Kenneth L. Musgrave and/or his affiliated entities (hereinafter, "MUSGRAVE"). This release is specific to and applies to MUSGRAVE ONLY.
> It is our understanding that MUSGRAVE plans to submit an alternative proposal that

> will be comparable to the terms and conditions contained within contract [sic] to which this addendum is attached. MUSGRAVE has represented to the BUYER that he can close immediately upon acceptance of an alternative purchase contract.

(Emphasis in original.) The copy of the amendment in the record is not signed by JP Morgan. However, AKB does not dispute that, following execution of the ACA, JP Morgan could entertain the alternative purchase agreement contemplated by the ACA.

**7.** K.L.M. could not recall whether that conversation with JP Morgan took place before or after AKB withdrew from the AKB/JP Morgan Contract.

**8.** The record contains a January 3, 2008 communication from "Ken Musgrave" to Hamilton in which he states "we never heard from [JP Morgan] after our presentation. . . ."

facilitation of K.L.M. and K.P.M.'s meeting with JP Morgan regarding the proposed purchase of the Ranch by the Musgrave Foundation. The check was deposited in AKB's bank account on November 28, 2007.

By letter dated November 29, 2007, counsel for AKB sent written notice to JP Morgan of AKB's termination of the AKB/JP Morgan Contract and a request for the refund of AKB's $500,000 earnest money deposit, plus accrued interest.[9] Hamilton stated in his affidavit that after entering into the ACA, "Musgrave" stated he would not pay any inspection period extension fees and did not "see where that was his problem." Hamilton "felt" he had "no real economic option"; on behalf of AKB, he contacted JP Morgan and cancelled the AKB/JP Morgan Contract. In mid-December 2007, K.P.M. learned that AKB had terminated the AKB/JP Morgan Contract on November 29, 2007.[10]

*The Musgrave/JP Morgan Contract*

JP Morgan did not accept the proposal contemplated by the ACA for purchase of the Ranch by the Musgrave Foundation. Negotiations with JP Morgan continued, however, and on April 14, 2008, "Musgrave Enterprises, Inc. and/or Assigns"[11] entered into a contract with JP Morgan for purchase of the Ranch (the Musgrave/JP Morgan Contract).[12] Before the August

26, 2008 deadline for closing the sale of the Ranch under the Musgrave/JP Morgan Contract, Musgrave Enterprises terminated the contract.[13]

## Procedural Background

AKB sued appellees Musgrave Enterprises, Inc., Musgrave & Musgrave, LLP, and K.L.M. asserting claims of fraud, breach of contract, and tortious interference with contract. Appellees filed a traditional and no-evidence motion for summary judgment and a supplement thereto. AKB filed an amended petition, asserting an additional claim of negligent misrepresentation, and a response to appellees' motions for summary judgment. Appellees also filed objections to AKB's summary judgment evidence. The record contains no rulings on those evidentiary objections.

The trial court granted summary judgment in favor of appellees. That order states the trial court considered appellees' traditional and no-evidence motion for summary judgment and supplement thereto, supporting summary judgment evidence, arguments of counsel, and relevant legal authorities, and "is of the opinion that no genuine issue of material fact exists." The trial court signed a final judgment ordering AKB take nothing by way of its claims against appellees and stating

9. There is no evidence that AKB provided a copy of this contract termination notice to appellees or otherwise notified appellees AKB had surrendered its rights under the AKB/JP Morgan Contract.

10. On December 17, 2007, a newspaper article discussed AKB's withdrawal from the AKB/JP Morgan Contract and that the Ranch was "off the selling block."

11. In his deposition, K.L.M. stated "assigns" would "have been the foundation." He testified, "Say that I'm fixing to buy a piece of property and I don't know whether I'm going

to own that property or sell it. Normally, the contract is Musgrave Enterprises or its nominee, until I have a chance to talk with the accountant and see how he wants to set it up, but the assets never go into Musgrave Enterprises."

12. The Musgrave/JP Morgan Contract was signed by "Kenneth L. Musgrave, President, Musgrave Enterprises, Inc." and Wilson for JP Morgan.

13. Musgrave Enterprises forfeited the nonrefundable earnest money deposit of $1,000,000 under the Musgrave/JP Morgan Contract.

all relief not expressly granted in the judgment is denied. AKB filed this appeal.

## Objections to AKB's Summary Judgment Evidence

In its first issue, AKB asks this Court to determine whether the trial court implicitly granted or denied appellees' objections to AKB's summary judgment evidence. In its second issue, AKB asserts the trial court erred if it implicitly granted appellees' objections to AKB's summary judgment evidence. In their brief, appellees do not respond to AKB's arguments concerning appellees' objections to AKB's summary judgment evidence, "because, even assuming such evidence was admissible, it was nonetheless sufficient [sic] to defeat Appellees' demonstrated entitlement to judgment as a matter of law that AKB Hendrick take nothing on any of its claims."

■ The record contains no ruling by the trial court on appellees' objections to AKB's summary judgment evidence. There is a split of authority regarding whether, pursuant to appellate rule of procedure 33.1(a)(2)(A), an objection to summary judgment evidence can be preserved by an implicit ruling in the absence of a written, signed order. *See Hewitt v. Biscaro*, 353 S.W.3d 304, 307 (Tex.App.-Dallas 2011, no pet.). This Court has determined the "better practice is for the trial court to disclose, in writing, its rulings on all evidence before the time it enters the order granting or denying summary judgment." *Hogan v. J. Higgins Trucking, Inc.*, 197 S.W.3d 879, 883 (Tex.App.-Dallas 2006, no pet.) (quoting *Broadnax v. Kroger Tex., L.P.*, 05–04–01306–CV, 2005 WL 2031783, at *1–2 (Tex.App.-Dallas 2005, no pet.) (mem. op.)). In response to AKB's first issue, we decline to conclude on this record that the trial court implicitly ruled on appellees' objections to AKB's summary

judgment evidence. Having concluded the trial court did not implicitly rule on appellees' objections to AKB's summary judgment evidence, we need not address AKB's second issue. *See* Tex.R.App. P. 47.1.

## Summary Judgment

### Standard of Review

We review de novo a trial court's decision to grant or deny a motion for summary judgment. *See Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex.2007). The standards of review for traditional and no-evidence summary judgments are well known. *See Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985); *Gen. Mills Rests., Inc. v. Tex. Wings, Inc.*, 12 S.W.3d 827, 832–33 (Tex.App.-Dallas 2000, no pet.). With respect to a traditional motion for summary judgment, the movant has the burden to demonstrate that no genuine issue of material fact exists and he is entitled to judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c); *Nixon*, 690 S.W.2d at 548–49. We review a no-evidence summary judgment under the same legal sufficiency standard used to review a directed verdict. *See Tex. Wings, Inc.*, 12 S.W.3d at 832–33; *see also* Tex.R. Civ. P. 166a(i). To defeat the no-evidence summary judgment, the nonmovants are required to produce evidence that raises a genuine issue of fact on each challenged element of their claims. *See Tex. Wings, Inc.*, 12 S.W.3d at 832–33; *see also* Tex.R. Civ. P. 166a(i).

■ We consider the evidence in the light most favorable to the nonmovants. *See Nixon*, 690 S.W.2d at 548–49. Every reasonable inference must be indulged in favor of the nonmovants and any doubts resolved in their favor. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex.2005). When a party moves for summary judg-

ment on multiple grounds and the trial court's order granting summary judgment does not specify the ground or grounds on which it was based, the party appealing that order must negate all possible grounds upon which the order could have been granted. *See Star–Telegram, Inc. v. Doe,* 915 S.W.2d 471, 473 (Tex.1995); *Jarvis v. Rocanville Corp.,* 298 S.W.3d 305, 313 (Tex.App.-Dallas 2009, pet. denied). We will affirm the summary judgment if any theory advanced by the movant is meritorious. *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989).

When a party moves for a traditional summary judgment under rule 166a(c) and a no-evidence motion for summary judgment under rule 166a(i), we first review the trial court's judgment under the standards of 166a(i). *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 600 (Tex.2004); *Wyckoff v. George C. Fuller Contracting Co.,* 357 S.W.3d 157, 163 (Tex.App.-Dallas 2011, no pet.). If the nonmovant failed to produce more than a scintilla of evidence under that burden, then there is no need to analyze whether the movant's summary judgment proof satisfied the rule 166a(c) burden. *Wyckoff,* 357 S.W.3d at 163.

### Fraud

In its third issue, AKB asserts the trial court erred in granting summary judgment on its fraud claim. AKB argues it produced evidence on each element of its claim and raised a "reasonable inference" that K.L.M. misrepresented facts "in order to induce AKB to enter into [the ACA], which was then used to squeeze AKB out of [the AKB/JP Morgan Contract], causing damages, and then allegedly negated when [K.L.M.] structured his eventual purchase to avoid his obligations."

■ The elements of fraud are:

(1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.,* 341 S.W.3d 323, 337 (Tex.2011) (quoting *Aquaplex, Inc. v. Rancho La Valencia, Inc.,* 297 S.W.3d 768, 774 (Tex.2009) (per curiam)).

AKB contends two "assurances" by K.L.M. were fraudulent misrepresentations, one having to do with the fees for extensions of the inspection period under the AKB/JP Morgan Contract, and the other having to do with K.L.M.'s plan to have a nonprofit entity purchase the Ranch.[14] Appellees moved for traditional summary judgment on AKB's fraud claim on the grounds that the alleged representations that form the basis of AKB's fraud claim are not sufficiently definite or certain to constitute fraudulent representations, and AKB did not justifiably and detrimentally rely on the alleged representations. Appellees also moved for a no-

---

14. According to AKB's answers to interrogatories, K.L.M. made two misrepresentations that form basis of AKB's fraud claim:

When Hamilton expressed his doubts that [K.L.M.] could buy the land in the name of his proposed Musgrave Foundation, [K.L.M.] told Hamilton that this was not Hamilton's problem, and that his account-ants would take care of those issues, and that AKB should not worry about that type of issue.

When Hamilton expressed his concerns about the looming deadline and extension obligations in the underlying contract, Musgrave told Hamilton that he thought he could help out with those payments.

evidence summary judgment on each element of AKB's fraud claim.

*Proposal for Nonprofit Entity to Purchase the Ranch*

With regard to K.L.M.'s proposed purchaser of the Ranch, Hamilton stated he was concerned that K.L.M. intended to purchase the Ranch using the Musgrave Foundation, a nonprofit organization. Hamilton stated he told K.L.M. that he did not see how he would be able to purchase the Ranch "under his Foundation." AKB contends K.L.M. made a fraudulent misrepresentation by assuring Hamilton "that he would work out an arrangement to buy the property with this entity." Hamilton states that without that reassurance, he would not have signed the ACA as it was drafted.

■ Appellees moved for traditional summary judgment and no-evidence summary judgment on the justifiable and detrimental reliance element of AKB's fraudulent misrepresentation cause of action. Generally, reliance on representations made in a business or commercial transaction is not justified when the representation takes place in an adversarial context. *Coastal Bank SSB v. Chase Bank of Tex., N.A.,* 135 S.W.3d 840, 843 (Tex.App.-Houston [1st Dist.] 2004, no pet.); *see also McCamish, Martin, Brown Loeffler v. F.E. Appling Interests,* 991 S.W.2d 787, 794 (Tex.1999). In determining whether AKB met the justifiable reliance element, we must consider the nature of the relationship and the contract. *See Coastal Bank SSB,* 135 S.W.3d at 843. A party to an arm's length transaction must exercise ordinary care for the protection of his own interests and is charged with knowledge of all facts that would have been discovered by a reasonably prudent person similarly situated; a failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party. *Thigpen v. Locke,* 363 S.W.2d 247, 251 (Tex.1962).

■ The record establishes this was an arm's length transaction between sophisticated businessmen. Hamilton, a "member" of AKB Investments, LLC, the general partner of AKB, the entity formed to acquire the Ranch, attested that over the course of two years and "primarily because of [his] experience with trusts and trust departments," he was able to negotiate the AKB/JP Morgan Contract. In his affidavit, Hamilton stated there were "extensive negotiations" between him and K.L.M. before reaching agreement for "Musgrave" to make an offer to purchase the Ranch from JP Morgan. Hamilton communicated to JP Morgan that K.L.M. is a "well known investor in ranch purchases and developments." Further, Hamilton expressed doubt about the ability of a nonprofit foundation to purchase the Ranch. *See Grant Thornton v. Prospect High Income Fund,* 314 S.W.3d 913, 923 (Tex. 2010) ("[A] person may not justifiably rely on a representation if 'there are "red flags" indicating such reliance is unwarranted.' ") (quoting *Lewis v. Bank of Am. NA,* 343 F.3d 540, 546 (5th Cir.2003)). We conclude there was no evidence of AKB's justifiable reliance on K.L.M.'s plan for the nonprofit Musgrave Foundation to purchase the Ranch.

■ Appellees also moved for no-evidence summary judgment on AKB's fraudulent misrepresentation claim asserting there is no evidence appellees made a material representation that was false or knew the alleged representation was false or made recklessly without knowledge of its truth. We conclude after review of the record that there is no evidence that the alleged statement was a material false representation. The summary judgment evidence establishes K.L.M. stated the al-

ternate purchase contract would be a proposal for the Musgrave Foundation to purchase the Ranch from JP Morgan. It is undisputed that the alternate purchase proposal made to JP Morgan was for purchase of the Ranch by the Musgrave Foundation. Further, while Hamilton expressed doubt the Ranch could be purchased by the proposed nonprofit entity, there is no evidence K.L.M.'s statement of his intention to propose purchase of the Ranch by the Musgrave Foundation was false when made. The summary judgment evidence is that K.L.M. expressed his confidence in his proposed plan for the nonprofit entity's purchase of the Ranch, "or [he] certainly wouldn't have been talking about it."

Because there is no evidence of AKB's justifiable reliance on, or of the falsity of, K.L.M.'s representation regarding the proposed purchase of the Ranch by the nonprofit Musgrave Foundation, the trial court did not err in granting summary judgment on AKB's fraud claim against appellees based on K.L.M.'s representation regarding the proposed purchase of the Ranch by the Musgrave Foundation.

*Extension Fees*

With regard to the $75,000 monthly fees to extend the inspection period under the AKB/JP Morgan Contract, Hamilton attested in his affidavit that K.L.M. said "he could 'help out' with those costs should they become an issue, and that I should not worry about that." Hamilton stated his understanding from "this and other discussions" was that K.L.M. would "pay, in whole or in part, any cost of extending the contract if that became necessary." Hamilton stated in his affidavit that after entering into the ACA, K.L.M. would not pay for extensions of the inspection period and did not "see where that was his problem." According to Hamilton, had K.L.M. not made "these and other assurances,"

Hamilton would have "either not entered into the contract, and sought another investor to deal with, or [he] would have negotiated some way to deal with the costs of extension should Musgrave's negotiations with JP Morgan prove lengthy."

We view the evidence in the light most favorable to nonmovant AKB, which indicates that K.L.M. made the statement that he could "help out" with AKB's costs of extending its contract with JP Morgan and AKB should not worry about those costs. A promise of future performance can be the basis of an actionable fraud claim if the promise was made with no intention of performing at the time it was made. *See Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 434 (Tex.1986); *see also Schindler v. Austwell Farmers Coop.,* 841 S.W.2d 853, 854 (Tex.1992) (per curiam) (plaintiff must show that promise was false at the time it was made); *Petras v. Criswell,* 248 S.W.3d 471, 476 (Tex.App.-Dallas 2008, no pet.); *Airborne Freight Corp. v. C.R. Lee Enters., Inc.,* 847 S.W.2d 289, 294 (Tex.App.-El Paso 1992, writ denied) (promise to do an act in the future is actionable fraud only when made with intention, design, and purpose of deceiving, and with no intention of performing the act). "[I]ntent may be inferred from a party's actions after the promise is made. However, the mere failure to perform, without more, is no evidence of the necessary intent." *Petras,* 248 S.W.3d at 476 (citing *Spoljaric,* 708 S.W.2d at 434); *see also T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 222 (Tex.1992) (while denying a promise has been made is a factor in showing no intent to perform when promise was made, a party's denial alone does not constitute evidence the party never intended to perform its promise); *Zanfardino v. Jeffus,* 117 S.W.3d 495, 499 (Tex.App.-Texarkana 2003, no pet.) (agreement to assume a debt is prospective

promise to perform, not misrepresentation of fact that could support a fraud claim unless accompanied by proof that, at time of the promise, the promisor intended not to perform); *Airborne Freight*, 847 S.W.2d at 294 (failure to perform, standing alone, is no evidence of the promisor's intent not to perform when the promise was made; it is a circumstance to be considered with other facts to establish intent). On this record, there is no evidence K.L.M. made the "promise" he "could 'help out'" with AKB's inspection period extension fees with the intention or purpose of deceiving AKB and with no intention to perform the alleged "promise" when made.

We conclude the trial court did not err in granting summary judgment on AKB's fraud claim against appellees based on K.L.M.'s statement regarding the proposed purchase of the Ranch by the nonprofit Musgrave Foundation or K.L.M.'s purported statement he could "help out" with AKB's inspection period extension fees. We resolve AKB's third issue against it.

### Breach of Contract

In its fourth issue, AKB argues the trial court erred in granting summary judgment on its breach of contract claim. AKB argues it raised "reasonable inferences" that "AKB had met its contractual obligations, [K.L.M.] had breached his, or was estopped from claiming that he did not, resulting in damages to AKB."

In its pleadings, AKB alleges a breach of contract by K.L.M., individually, or "as a general partner of Musgrave & Musgrave, LLP." AKB alleges K.L.M. breached the ACA by failing to pay AKB $1,000,000 when the Musgrave/JP Morgan Contract was entered into for purchase of the Ranch. AKB alleges the terms of the ACA "plainly state that [K.L.M.] through K.L.M. and Musgrave LLP (sic) 'upon a fully executed alternative purchase contract' 'shall ... pay $1,000,000. (One million dollars) to [AKB].'"

■■■ The elements of a breach of contract claim are: (1) the existence of a valid contract, (2) the plaintiff's performance or tendered performance, (3) the defendant's breach of the contract, and (4) damages as a result of the breach. *Paragon Gen. Contractors, Inc. v. Larco Constr., Inc.*, 227 S.W.3d 876, 882 (Tex. App.-Dallas 2007, no pet.). Appellees moved for traditional summary judgment on AKB's breach of contract claim on the grounds that the summary judgment evidence establishes: (1) K.L.M. is not a party to the ACA in his individual capacity; (2) AKB did not perform its obligation under the ACA, nor was AKB excused from performing under the ACA; (3) "the Musgrave Entities" (Musgrave Enterprises, Inc. and Musgrave & Musgrave, LLP) did not breach the ACA; and, alternatively, (4) AKB committed a first material breach of the ACA, excusing "the Musgrave Entities'" further performance.[15]

---

15. With regard to appellees' alternative traditional ground for summary judgment on AKB's breach of contract claim, we note the ACA provides that the AKB/JP Morgan Contract was to remain in effect until an alternate purchase contract had been executed between JP Morgan and the Musgrave Foundation. However, AKB terminated the AKB/JP Morgan Contract on November 29, 2007, in advance of the March 1, 2008 closing date of the AKB/JP Morgan Contract. In his affidavit,

Hamilton stated it was never his "understanding" that the ACA language requiring that the AKB/JP Morgan Contract remain in effect until an alternate purchase contract had been executed imposed a duty on AKB to maintain the AKB/JP Morgan Contract by paying the extension fees of $75,000 each. However, Hamilton's "understanding" contradicts the written terms of the ACA.

If the language in a contract can be given a certain or definite meaning, then the lan-

Appellees also moved for no-evidence summary judgment on AKB's breach of contract claim, asserting there is no evidence AKB performed, tendered performance, or was excused from performing its obligations under the ACA, and no evidence any appellee breached the ACA.

The ACA indicates that its purpose is to memorialize the terms of an arrangement, as agreed to by AKB, wherein AKB was to coordinate presentation to JP Morgan of an alternate purchase contract for the acquisition of the Ranch by the Musgrave Foundation. The ACA provides that on or before November 26, 2007, after Musgrave Enterprises, Inc. had the opportunity to present the alternate purchase contract to JP Morgan, Musgrave & Musgrave, LLP would pay AKB $25,000. It is undisputed that the alternate purchase contract was presented to JP Morgan and that AKB was paid $25,000 on November 26, 2007 for AKB's facilitation of the meeting with JP Morgan.

 The ACA also provides that "[u]pon a fully executed alternate purchase contract," Musgrave & Musgrave, LLP was to pay $1,000,000 to AKB. The record before us demonstrates that JP Morgan did not enter into an alternate purchase contract for sale of the Ranch to the Musgrave Foundation. The contract ultimately entered into after AKB's termination of the AKB/JP Morgan Contract, and after the closing date of the AKB/JP Morgan Contract, was between "Musgrave Enterprises, Inc. and/or Assigns" and JP Morgan. The ACA contractual obligation for Musgrave & Musgrave, LLP to pay to AKB $1,000,000 upon the execution of an alternate purchase contract between JP Morgan and the Musgrave Foundation did not arise.

Because no alternate purchase contract was entered into between the Musgrave Foundation and JP Morgan, there is no evidence of the essential element of AKB's breach of contract claim that any appellee breached the ACA by failing to pay AKB $1,000,000. We conclude the trial court did not err in granting summary judgment in favor of appellees on AKB's breach of contract claim against appellees. We resolve AKB's fourth issue against it.

### Tortious Interference With Contract

In its fifth issue, AKB asserts the trial court erred in granting summary judgment to appellees on AKB's claim of tortious interference with contract. AKB argues on appeal that it produced evidence on each element of its tortious interference claim, raising "reasonable inferences" that K.L.M. "intentionally made AKB's performance of its underlying contract with JP Morgan more burdensome, eventually causing it to lose that contract, damaging it through the loss of other business opportunities that it forewent to deal with [K.L.M.]." Appellees respond there is no evidence that appellees made AKB's per-

guage is not ambiguous, and we are obligated to interpret the contract as a matter of law. *DeWitt Cnty. Elec. Co-op., Inc. v. Parks,* 1 S.W.3d 96, 100 (Tex.1999); *Vincent v. Bank of Am., N.A.,* 109 S.W.3d 856, 867 (Tex.App.-Dallas 2003, pet. denied). An ambiguity does not arise merely because the parties to an agreement advance differing interpretations. *Vincent,* 109 S.W.3d at 867; *see also City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518 (Tex.1968) (if contract un-

ambiguous, parties' objective, not subjective, intent controls). A contract is ambiguous only if the application of established rules of construction leaves an agreement susceptible to more than one reasonable meaning. *DeWitt Cnty. Elec. Co-op.,* 1 S.W.3d at 100. When, as here, the contract is unambiguous, we apply the pertinent rules of construction and enforce the contract as written. *See Vincent,* 109 S.W.3d at 867.

formance under the AKB/JP Morgan contract more burdensome or expensive.

In its pleadings, AKB asserts K.L.M. intentionally interfered with AKB's performance under the AKB/JP Morgan Contract by making that performance more burdensome and expensive, eventually causing AKB to "discontinue its option" under that contract. In their traditional motion for summary judgment, appellees asserted there is no genuine issue of material fact to support a claim that appellees tortiously interfered with AKB's performance under the AKB/JP Morgan Contract because the specific allegations asserted by AKB in support of its claim did not cause AKB to suffer any additional burden or expense in performing under the AKB/JP Morgan Contract, and AKB did not suffer any actual damages as a result of any alleged tortious interference by appellees. Appellees also moved for a no-evidence summary judgment on AKB's tortious interference claim, asserting there is no evidence appellees willfully or intentionally interfered with AKB's rights under the AKB/JP Morgan Contract or that any alleged interference by appellees proximately caused any actual damages to AKB.

The elements of a tortious interference with contract cause of action are (1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the claimant's injury, and (4) caused actual damages or loss. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex.2000). It is not necessary that the alleged tortious conduct result in an actual breach or cessation of the contractual relationship. *See Int'l Union United Auto. Aerospace & Agric. Implement Workers of Am. Local 119 v. Johnson Controls, Inc.*, 813 S.W.2d 558, 568 (Tex.App.-Dallas 1991, writ denied). It is sufficient that the tortious conduct make performance more burdensome or difficult. *Id.; see also Tippett v. Hart*, 497 S.W.2d 606, 610 (Tex.Civ.App.-Amarillo) (claim actionable for act "which retards, makes more difficult or prevents performance"), *writ ref'd n.r.e.*, 501 S.W.2d 874 (Tex.1973) (per curiam). However, "[o]rdinarily, merely inducing a contract obligor to do what it has a right to do under the subject contract is not actionable interference." *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997); *COC Servs., Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 670 (Tex.App.-Dallas 2004, pet. denied).

AKB's right to extend the inspection period by payment of extension fees under the AKB/JP Morgan Contract existed prior to appellees' involvement with AKB concerning an alternate purchase contract and negotiation of the ACA. There is no evidence that a purported statement by K.L.M. that he "could 'help out' with [the extension fees]" made AKB's performance more burdensome or expensive than the "burdens" or "expenses" to which AKB had contractually agreed prior to negotiations regarding an alternate purchase contract. Neither K.L.M.'s purported statement about "help" with the inspection period extension fees nor the terms of the ACA obligated AKB to expend any funds not already prescribed in the AKB/JP Morgan Contract. In his affidavit, Hamilton states "AKB was wise to forgo" payment of the $75,000 extension fees to extend the inspection period of the AKB/JP Morgan Contract, because "Musgrave" did not execute a contract with JP Morgan for purchase of the Ranch until after the March 1, 2008 closing date under the AKB/JP Morgan Contract, had all three options to extend the inspection period been exercised by AKB. Further, the ACA specifically provides that it shall in

no way be construed to **"have jeopardized the ability of [AKB] (Buyer) to perform"** under the AKB/JP Morgan Contract. (Emphasis in original.) Further, there is no evidence in the record of other business opportunities AKB "forewent to deal with [K.L.M.]." There is one reference in AKB's summary judgment evidence to a statement in a January 2008 email from Hamilton to "Ken" Musgrave that "we continue to get phone calls from interested parties and have simply told them that we stepped aside for another group without naming the group." However, that communication was well after AKB entered into the ACA and after AKB terminated the AKB/JP Morgan Contract and does not establish a business opportunity AKB "forwent to deal with" any appellee. In his affidavit, Hamilton stated, "Because the Trust never marketed the property there were not any buyers seeking the Ranch."

We conclude the trial court did not err in granting summary judgment in favor of appellees on AKB's tortious interference with contract claim. We resolve AKB's fifth issue against it.

### Negligent Misrepresentation

After appellees filed their traditional and no-evidence motion for summary judgment and the supplement thereto, AKB filed an amended petition asserting a negligent misrepresentation cause of action against appellees. In its sixth issue, AKB contends the trial court erred in granting summary judgment on its negligent misrepresentation claim, because that claim was not addressed in appellees' motion for summary judgment.

 "Although summary judgment generally may not be granted on a claim not addressed in the summary judgment proceeding, it may be granted on later pleaded causes of action if the grounds asserted in the motion show that the plain-

tiff could not recover from the defendant on the later pleaded causes of action." *McIntyre v. Wilson,* 50 S.W.3d 674, 684–85 (Tex.App.-Dallas 2001, pet. denied); *see also Smith v. Heard,* 980 S.W.2d 693, 697 (Tex.App.-San Antonio 1998, pet. denied) (acknowledging that courts have granted summary judgment on causes of action not addressed in motion if movant has conclusively disproved ultimate fact central to all causes of action alleged or if unaddressed claims are derivative of addressed claims); *see also Andrews v. E. Tex. Med. Ctr.-Athens,* 885 S.W.2d 264, 266–67 (Tex.App.-Tyler 1994, no writ) (recognizing that if amended pleadings do not materially change cause of action, original summary judgment motion is a sufficient basis upon which to grant complete relief).

 The elements of a negligent misrepresentation cause of action are: (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation. *McCamish, Martin, Brown & Loeffler,* 991 S.W.2d at 791 (Tex.1999); *Bever Props., L.L.C. v. Jerry Huffman Custom Builder, L.L.C.,* 355 S.W.3d 878, 892 (Tex. App.-Dallas 2011, no pet.). "Significantly, the sort of 'false information' contemplated in a negligent misrepresentation case is a misstatement of *existing fact." Airborne Freight,* 847 S.W.2d at 294. (emphasis in original); *see also Allied Vista Inc. v. Holt,* 987 S.W.2d 138, 141 (Tex.App.-Houston [14th Dist.] 1999, pet. denied) (false information contemplated in a negligent misrepresentation case is a misstatement of existing fact, not a promise of future conduct); *Miksch v. Exxon Corp.,* 979 S.W.2d 700, 706 (Tex.App.-Houston [14th

Dist.] 1998, pet. denied) (promise to do or refrain from doing an act in the future is not actionable because it is not a misrepresentation of an existing fact).

The misrepresentations asserted by AKB as the bases of its negligent misrepresentation claim are the same misrepresentations asserted as the bases of its fraud claim. We have concluded there is no evidence that K.L.M's representation regarding the proposed purchase of the Ranch by the Musgrave Foundation was false when made or justifiably relied upon by AKB. We have also concluded there is no evidence that K.L.M.'s "promise" that he could "help out" with AKB's inspection period extension fees was made with an intention or purpose of deceiving AKB and with no intention to perform the "promise" when made.

The grounds asserted by appellees for a no-evidence summary judgment on AKB's fraud claim show that AKB could not recover from appellees on the later pleaded cause of action for negligent misrepresentation. A cause of action for fraudulent misrepresentation requires proof of a false representation, and a negligent misrepresentation claim requires proof that the defendant has provided false information. *See Italian Cowboy Partners, Ltd.*, 341 S.W.3d at 338; *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991). K.L.M.'s representation regarding the proposed purchase of the Ranch by the Musgrave Foundation and conditional promise to "help out" in the future with inspection period extension fees were not false representations of *existing fact.*

Moreover, causes of action for fraud and negligent misrepresentation both require showing of actual and justifiable reliance. *Grant Thornton,* 314 S.W.3d at 923. Having concluded in the context of AKB's fraud claim that there is no evidence of justifiable reliance by AKB concerning K.L.M.'s representation regarding the pro-

posed purchase of the Ranch by the Musgrave Foundation, AKB's negligent misrepresentation claim concerning this same representation must also fail for the reason there is no evidence of the common element of actual and justifiable reliance.

Because there is no evidence to support the elements of false representation and justifiable reliance common to AKB's fraud and negligent misrepresentation claims, AKB's negligent misrepresentation claim fails as a matter of law. *See also Heard,* 980 S.W.2d at 697 (summary judgments granted on causes of action not addressed in motion if movant has conclusively disproved ultimate fact central to all causes of action alleged). We conclude the trial court did not err in granting summary judgment in favor of appellees on AKB's negligent misrepresentation claim. We resolve AKB's sixth issue against it.

### Conclusion

We conclude the trial court did not err in granting summary judgment in favor of appellees on AKB's causes of action. Accordingly, we affirm the trial court's judgment.