# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 9, 2026

Lyle W. Cayce
Clerk

No. 25-20021

In the Matter of JPG Renewables L.L.C.,

*Debtor*,

Bestrenewedoil, L.L.C.; Carlos Ramirez; DRCHR Oil & Gas Investments, L.L.C.,

*Appellees*,

*versus*

Juan Fernando Pastrana; Lub-Line, L.L.C.,

*Appellants*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:24-CV-698

_____

Before Richman, Higginson, and Oldham, *Circuit Judges*.

Stephen A. Higginson, *Circuit Judge*:[*]

This case involves a multi-million-dollar fraud scheme in which Defendant–Appellant Juan Fernando Pastrana induced Plaintiff–Appellees

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

to invest in his venture to build an oil recycling facility in Harris County, Texas. After a bench trial, the bankruptcy court awarded Plaintiff–Appellees over four million dollars in damages. The district court affirmed that judgment. Defendant–Appellants now challenge these decisions on four distinct grounds. For the reasons explained below, we AFFIRM.

## I.

Plaintiff–Appellees are Bestrenewedoil, L.L.C. and Carlos Ramirez, both investors in the oil recycling venture ("Plaintiffs"). Dr. Enrique Quintero is the founder and sole member of Bestrenewedoil, a special purpose entity he created for this investment. Ramirez invested personally but later transferred his investment to a special purpose entity called DRCHR Oil & Gas Investments, L.L.C., of which he is the sole member. Defendant–Appellants are Juan Fernando Pastrana and his company Lub-Line, L.L.C. ("Defendants"). Pastrana is the sole owner of Lub-Line and also owned JPG Renewables, L.L.C. ("JPG") and JPG Real Estate, L.L.C. ("JPG Real Estate").

## A.

The events relevant to this dispute date back to 2009. Quintero and Pastrana were neighbors, and Quintero and Ramirez are friends. Quintero is a medical doctor, and Ramirez leads a family manufacturing company. Outside of these roles, Quintero and Ramirez have occasionally invested in other ventures, such as real estate. Around 2009, Pastrana began developing an idea for a used oil recycling facility ("the Project"), and in 2012,[1] he founded JPG to assist with the Project. Eventually, Pastrana approached Quintero and Ramirez about investing in the Project. Pastrana touted his

_____

[1] JPG was originally called "JPV Renewables Corp." and was converted to JPG in 2014.

No. 25-20021

experience as the founder and CEO of Lub-Line, a specialty oil distributor, but needed Plaintiffs' capital.

JPG hired an investment bank called Focus Strategies to help fundraise for the Project, including by creating a document called the private placement memorandum ("PPM"). The final PPM[2] sent to Plaintiffs was about 100 pages long and detailed business plans and investment terms, among other aspects of the Project. Pastrana, Lub-Line, and JPG supplied the financial information reflected in the PPM, including specific dollar figures for early development costs incurred and investments that JPG and Pastrana had made in the Project.

The PPM claimed, "As of June 2014, JPG had incurred development costs of $7,069,489."[3] That number was off by at least $5 million. Focus Strategies calculated JPG's costs as stated in the PPM from a workbook that listed "soft costs" totaling $3,512,852 and "land costs" totaling $3,556,637 by June 2014. That workbook included intentionally fabricated numbers and costs that JPG never incurred, which Pastrana, Lub-Line, and JPG provided in their submissions to Focus Strategies.[4]

---

[2] Because the investment agreements and PPMs shared with Bestrenewedoil and Ramirez are identical in substance, we refer to them singularly as "the PPM" and "the Investment Agreement" for readability.

[3] The parties sometimes refer to this figure as Pastrana's $7 million investment, rather than JPG's investment, so we use the two interchangeably. Because Pastrana owned JPG, this distinction is not significant, and the parties do not argue otherwise.

[4] While Defendants state in passing that they "deny that any alleged misrepresentations were fraudulent or that [Defendants'] conduct was intentional," they do not meaningfully challenge either of these issues on appeal. They do not point to any facts to support the calculations reflected in the PPM or to show that Pastrana did not manufacture these costs and share them with Focus Strategies. The bankruptcy court found that these numbers were "simply made up," "without merit," and "dubious," and the record evidence supports this conclusion.

3

No. 25-20021

Specifically, three sets of soft costs in the workbook were inaccurate, resulting in an overstatement of about $1,800,000 in the PPM. First, the workbook stated that Lub-Line was responsible for a $939,906 cost labeled "Project Development Advisor – Goldsberry." Fred Goldsberry is an engineer who consulted on the Project, but he testified that he did not bill Lub-Line or JPG for his services, was not paid, and did not expect to be paid. He described his advising as "pro bono" and stated that he "volunteered to do" it with the understanding that he may have eventually been compensated with shares if the Project was ultimately successful. Thus, this $939,906 line item was entirely unsupported.

Second, the workbook listed $378,700 in costs for "Consultant – Accounting – Rodriguez." Gabriela Rodriguez was an accountant for Lub-Line who did minimal work for JPG but was not paid separately by JPG. Although Rodriguez did not testify, Pastrana confirmed at trial that Rodriguez was not paid by JPG. Thus, these costs were also, as the bankruptcy court found, "simply made up."

Third, the workbook overstated payments made to an engineering firm called Pesco-Beam. The workbook reflected $778,000 in costs for Pesco-Beam, but JPG only paid Pesco-Beam $303,000, creating a $475,000 discrepancy. Thus, the PPM contained materially false information regarding JPG's purported $7 million investment.

The land costs in the PPM were also inaccurate. The PPM stated that JPG had incurred $3,556,837 in land costs, which is false for two reasons: (1) JPG never owned the land, and (2) this figure does not represent the costs of the land purchase executed by Pastrana's other entities. In July 2013, Lub-Line bought the tract of land relevant to this case and later transferred it to JPG Real Estate. The down payment was $1,305,312, plus an additional $152,393 in related closing costs. The amount in the workbook and PPM,

4

however, shows the down payment and fees, none of which JPG ever incurred, along with another $2,098,932 in appreciation of land value. But the land value never appreciated. At trial, Pastrana admitted that he was unsure how the appreciation was valued because any appreciation would have assumed that there was an oil recycling facility on the land, which was not true. In addition to the incorrect land costs, the PPM represented that the land would be transferred to JPG at the time of Plaintiffs' investment, which aligned with what Pastrana had told Plaintiffs about the land. Pastrana admitted in his trial testimony that JPG never owned the land or incurred any costs related to it.

Plaintiffs, who lacked knowledge of these inaccuracies, relied on the statements in the PPM. Plaintiffs had spent nine months completing due diligence and preparing to invest. They had upwards of ten meetings with Focus Strategies and Pastrana and found the team to be "knowledgeable" and "credible." Quintero specifically requested materials for him to study and have his counsel review. Plaintiffs also met with Focus Strategies to discuss the PPM specifically and were able to ask questions about the document. Plaintiffs testified that the PPM seemed "well-prepared," "comprehensive," and "professional."

With no reason to doubt the PPM's accuracy, the false statements in the PPM were highly influential in Plaintiffs' investment decision. Quintero testified that he believed Focus Strategies received its information from Pastrana, and he believed that information was trustworthy because he thought that Pastrana "had a vested interest in making sure the project came to fruition" through his initial $7 million investment. Similarly, Ramirez explained that Pastrana's investment was important to him because it determined how equity would be divided, and he testified that he would not have invested on the terms he did if Pastrana had not already invested $7 million.

The expected transfer of land to JPG was also important to Plaintiffs' investment decision. Quintero testified, "the land was very important in this"; "[w]ithout the land, there was no project." Ramirez similarly explained that the land was important because the land would provide some protection for their investment: "[A]s an investor, if the project fails, we at least [] have the land," so "we have some value." Ramirez testified that he would not have invested in JPG if he knew the land would not be transferred until a later stage.

On August 28, 2014, Quintero executed an investment agreement with JPG and Pastrana, on behalf of Bestrenewedoil. The next day, Ramirez signed an identical agreement with JPG and Pastrana. Bestrenewedoil and Ramirez each received a 12.6% ownership interest in JPG, in exchange for a $1.625 million investment from each of them. Plaintiffs' investments were part "Tranche A" in the "development" stage, and after development, "final financing" would occur with "Tranche B" investments.

After securing Plaintiffs' investments, Defendants' fraudulent conduct continued. From September 2014 through March 2015, JPG paid Lub-Line a service fee for engineering and design services ranging from $39,600 to $89,100 per month. Pastrana testified that those payments were for Goldsberry's services. But Lub-Line never paid Goldsberry for his services, and Goldsberry testified that, just like his pre-August 2014 work, he did not bill Defendants or expect to be compensated by JPG, except possibly in shares if the Project succeeded.

Plaintiffs were not sophisticated oil and gas investors. They expected to be passive participants in JPG's business, and without any industry experience or expertise, could not have meaningfully participated in developing the Project. Plaintiffs followed up with Pastrana about their investment, and Pastrana continually represented that everything was

"flowing and moving along like it should." Meanwhile, Pastrana shared inaccurate reports with Plaintiffs and withheld accurate financial reporting that would have allowed Plaintiffs to uncover the fraud.

That changed on January 17, 2017. At a meeting that day (termed "the alarm meeting" by Plaintiffs and the bankruptcy court), Pastrana reported that the land owned by JPG Real Estate—meaning the Project site, which Plaintiffs believed JPG owned—was "becoming a financial strain on JPG Real Estate, LLC." Ramirez testified that he had never heard of JPG Real Estate, and both Plaintiffs were "shocked" by Pastrana's revelations. As Quintero put it, "the alarm went off." In that meeting, Quintero suggested an audit, and both Quintero and Ramirez pushed for information. For over two years, Plaintiffs sought information from Pastrana and his counsel. Without any resolution, Plaintiffs ultimately decided to sue.

## B.

Plaintiffs originally filed this case in Texas state court on March 13, 2019. After a few years of litigation, the state court denied Defendants' motions for summary judgment. In February 2023, JPG filed a Chapter 7 bankruptcy petition and removed the action to the Southern District of Texas Bankruptcy Court. The case then proceeded to a four-day trial before the bankruptcy court. The bankruptcy court issued a memorandum opinion with its findings of fact and conclusions of law, holding (1) that Plaintiffs' causes of action accrued on January 17, 2017; (2) that contractual disclaimers in the investment documents did not bar Plaintiffs' claims; (3) that Plaintiffs prevailed on their claims of fraud, fraudulent inducement, and conspiracy[5];

---

[5] The bankruptcy court granted a motion for directed verdict and issued a take nothing judgment as to Gloria Pastrana, an additional defendant in the case below. That ruling is not before us on appeal.

and (4) that Plaintiffs were entitled to compensatory and exemplary damages. Defendants appealed to the district court, which requested significant briefing and conducted multiple hearings. The district court affirmed the bankruptcy court on all grounds.

Defendants now appeal to our court, asking us to reverse and render a take nothing judgment. Plaintiffs ask us to affirm, asserting that the bankruptcy court and district court properly applied Texas law.

## II.

"We review the decision of a district court, sitting in its appellate capacity, by applying the same standards of review to the bankruptcy court's finding[s] of fact and conclusions of law as applied by the district court." *In re Highland Cap. Mgmt.*, 57 F.4th 494, 499 (5th Cir. 2023) (quoting *ASARCO, Inc. v. Elliott Mgmt.* (*In re ASARCO, L.L.C.*), 650 F.3d 593, 600 (5th Cir. 2011)). We review the bankruptcy court's conclusions of law, as well as mixed questions of law and fact, de novo. *Id.* We review the bankruptcy court's findings of fact for clear error. *Id.* "The bankruptcy [court's] opportunity to make first-hand credibility determinations entitles its assessment of the evidence to deference by both the district court and this court alike." *In re Perry*, 345 F.3d 303, 309 (5th Cir. 2003). Thus, we do not "weigh the evidence anew." *Id.* Instead, "we must determine whether the evidence supports the bankruptcy court's findings and set them aside only if we are left with 'the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *In re Dennis*, 330 F.3d 696, 701 (5th Cir. 2003)).

## III.

There are four issues before us on appeal, and we consider each in turn. First, we address whether Plaintiffs' claims are timely. Second, we discuss whether disclaimers in the investment documents bar Plaintiffs' claims. Third, we evaluate the merits of Plaintiffs' claims—specifically,

whether Plaintiffs adequately proved justifiable reliance. Fourth and finally, we review the damages award. For the reasons discussed below, we affirm in full.

## A.

The parties' first dispute concerns the statute of limitations. They agree that Texas's four-year statute of limitations governs Plaintiffs' fraud, fraudulent inducement, and conspiracy claims, but they disagree about when the limitations period began to run. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.004(a)(4). Defendants contend that Plaintiffs' causes of action accrued on the dates of their investments—August 28 and 29, 2014—because (1) their injury occurred when they invested, and (2) the purportedly fraudulent misrepresentations were in the documents shared before they invested. Plaintiffs assert that the bankruptcy court and district court both properly held that their causes of action accrued on the date of the alarm meeting: January 17, 2017. We agree with the courts below. Plaintiffs' claims are timely.

"Generally, a claim accrues when the defendant's wrongful conduct causes the claimant to suffer a legal injury." *Berry v. Berry*, 646 S.W.3d 516, 523 (Tex. 2022). "A legal injury occurs—and the statute of limitations begins to run— 'when facts come into existence that authorize a party to seek a judicial remedy.'" *Id.* (quoting *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003)). For claims of fraud and fraudulent inducement, Texas courts "have long held that 'fraud prevents the running of the statute of limitations until it is discovered, or by the exercise of reasonable diligence might have been discovered.'" *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 57 (Tex. 2015) (quoting *Ruebeck v. Hunt*, 176 S.W.2d 738, 739 (Tex. 1943)). The reasoning underpinning this holding is intuitive: "a person cannot be permitted to avoid liability for his actions by

deceitfully concealing wrongdoing until limitations has run." *Id.* (quoting *S.V. v. R.V.*, 933 S.W.2d 1, 6 (Tex. 1996)). "[T]he date a cause of action accrues is normally a question of law," but "reasonable diligence is an issue of fact." *Id.* (citations omitted); *see also Est. of Ewers*, 695 S.W.3d 603, 622 (Tex. App.—Hous. [1st Dist.] 2024, no pet.) (opinion on rehearing) ("Unless reasonable minds cannot differ on issues like discovery of the wrong and reasonable diligence, these issues are for the factfinder to resolve.").

The bankruptcy court held that the statute of limitations began to run on January 17, 2017, when the information revealed at the alarm meeting "shocked" Plaintiffs and led them to investigate the fraud. Defendants insist that the bankruptcy court erred in this holding because Plaintiffs could have discovered the land costs fraud through reasonable diligence at the time of their investment by checking public land title records. According to Defendants, the title records provided Plaintiffs with constructive notice that JPG did not own the land; Lub-Line and then JPG Real Estate owned it.

The district court described this argument as "audacious," stating, "Defendants contend that even though they were lying to Plaintiffs, it was Plaintiffs' responsibility to figure out they were being lied to." The district court reasoned that public records did not convey constructive notice because there was "ambiguity about whether Pastrana had represented that he had transferred the land to JPG, or that he would soon transfer it" after Plaintiffs' investments. If the latter, public records would not have reflected a future transfer. Moreover, the district court noted that public records could not have put Plaintiffs on notice of Defendants' other fraudulent conduct.

We agree with the courts below on this point. Although accurate public records can create constructive notice, inaccurate or irrelevant ones do not. *Hooks*, 457 S.W.3d at 59. As the district court explained, public

records would not have reflected JPG's ownership at the time of the investment. And as the Texas Supreme Court held in *Hooks*, requiring Plaintiffs to check more recent filings after their investment "is a higher burden than reasonable diligence requires." 457 S.W.3d at 60; *cf. JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 658 (Tex. 2018) (noting that "Texas courts have never held that a purchaser's failure to search the deed records would bar his fraud action against the seller" in the justifiable reliance context (quoting *Ojeda de Toca v. Wise*, 748 S.W.3d 449, 451 (Tex. 1988))).

Defendants further argue that, even if Pastrana represented that he would soon transfer the land to JPG, Plaintiffs never followed up on the land ownership, nor asked for the Focus Strategies workbook or related documents. First, Plaintiffs did follow up with Pastrana after the investment. In response, Pastrana shared false reports with them and continually represented to Plaintiffs that everything with the Project was proceeding "smoothly." Plaintiffs were not required to go further in the exercise of reasonable diligence because they were not sophisticated investors in the industry and had no reason to doubt Pastrana's representations. *Contra Orca Assets*, 546 S.W.3d at 656–58 (finding that failure to check land records after an investment was one factor contributing to negation of justifiable reliance because the parties, who were sophisticated oil and gas investors, had expressed significant doubts and concerns about the land ownership). Second, Defendants do not explain how Plaintiffs could have uncovered the fraud by reviewing additional documents. The Focus Strategies workbook and other investment documents were tainted by fraud, both before and after the investment.

"Because fraud vitiates whatever it touches, limitations does not start to run until the fraud is discovered or the reasonable exercise of diligence would discover it." *Hooks*, 457 S.W.3d at 57 (cleaned up). Defendants insist

that Plaintiffs should have done more, but they fail to show that additional inquiries would have uncovered the fraud, especially given Pastrana's continued misrepresentations after the investment. The record evidence demonstrates that Plaintiffs discovered the fraud on January 17, 2017.

Accordingly, we find no error in the bankruptcy court and district court's findings on accrual.[6] Plaintiffs' claims are timely, and we proceed to consider Defendants' substantive arguments.

### B.

The parties' second dispute centers on a few provisions in the investment documents. Defendants argue that a merger clause in the Investment Agreement and an attempted waiver provision in the PPM bar Plaintiffs' claims because Plaintiffs affirmatively disclaimed reliance on Defendants' representations—negating the reliance element of their fraud and fraudulent concealment claims. Plaintiffs respond that the provisions Defendants cite fail to satisfy Texas law's high bar for disclaiming reliance. We agree with Plaintiffs.

Under Texas law, a merger clause generally "does not waive the right to sue for fraud should a party later discover that the representations it relied upon before signing the contract were fraudulent." *Italian Cowboy*, 341 S.W.3d at 327; *see also LHC Nashua P'ship Ltd. v. PDNED Sagamore Nashua, L.L.C.*, 659 F.3d 450, 460 (5th Cir. 2011) (describing the "exacting" standard for disclaimers of reliance set forth in *Italian Cowboy*). If parties wish to disclaim reliance on certain representations, they must do so with "clear and unequivocal language." *Italian Cowboy*, 341 S.W.3d at 331.

---

[6] Because we affirm the lower courts' rulings on the date of accrual, we need not consider the parties' alternative arguments about whether fraudulent concealment tolled the statute of limitations.

No. 25-20021

Otherwise, the "contract is subject to avoidance on the ground of fraudulent inducement." *Id.* "[W]hether an adequate disclaimer of reliance exists" is a question of law. *Id.* at 333.

Defendants contend that Investment Agreement and PPM provisions work together to show that Plaintiffs explicitly disclaimed any reliance on representations in the PPM. The Investment Agreement's merger clause reads:

> This Agreement, together with the documents and instruments referred to herein, constitutes the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior or contemporaneous negotiations, agreements and understandings between such parties, whether written or oral, containing the subject matter hereof. *The parties hereto have not relied upon any promises, representations, warranties, agreements, covenants, or undertakings, other than those expressly set forth or referred to herein.*

The Investment Agreement expressly refers to the PPM in Section 1.1, which states that "JPG solicited" Plaintiffs' investment "through the delivery of the JPG Renewables, LLC Private Placement Memorandum." Section 1.2 then provides that the signatories agree to the Investment Agreement's terms, "[i]n addition to the terms and conditions . . . set forth in the" PPM. Section 1.2 continues, "[t]he purpose of this Agreement is to set forth those additional terms and conditions," complimenting the PPM. The PPM's relevant provision is longer:

> This Memorandum has been prepared from information, estimates, and assumptions provided by Management and other sources believed to be reliable. Nothing contained in this Memorandum is, or shall be relied upon, as a promise or representation by the Company's Advisors or the Company as to either past or future performance of the Company. The

13

contents of the Memorandum have not been independently verified by the Company's Advisors or the Company, and any of their respective affiliates, employees, or representatives expressly disclaims any and all liability relating to or resulting from the use of this Memorandum, or such other information as may be provided, whether communicated in oral or written form, to a potential investor or any of its affiliates or representatives. The recipient expressly understands and agrees that any estimates, projections and assumptions are uncertain and accordingly, no representation can be made as to their attainability. *Only those representations and warranties made in a definitive, written purchase agreement, and subject to such limitations and restrictions as may be specified therein, shall have any legal effect.*

Contrary to Defendants' assertions, these provisions do not operate to disclaim reliance and certainly do not do so clearly and unequivocally. *See Italian Cowboy*, 341 S.W.3d at 336. Sections 1.1 and 1.2 of the Investment Agreement refer to the PPM and provide that the Investment Agreement's purpose is to set forth *additional* terms and conditions. The PPM states, however, that "only" the representations made in the Investment Agreement shall have legal effect. The Investment Agreement's merger clause then incorporates the PPM, giving the PPM's representations legal effect and making these clauses circular, while simultaneously purporting to supersede it. With this tension in the contractual language, we cannot say that the parties have disclaimed reliance on representations in the PPM in "clear and unequivocal" terms. *Italian Cowboy*, 341 S.W.3d at 336. Thus, Plaintiffs' claims are not contractually barred.

Even assuming the Investment Agreement sufficiently incorporates the PPM without superseding it, the PPM's purported disclaimer clause falls well short of providing the clear and unequivocal language necessary under Texas law. The PPM provision Defendants reference divides into four

clauses, the first being, "Nothing contained in this Memorandum is, or shall be relied upon, as a promise or representation by the Company's Advisors or the Company as to either past or future performance of the Company." While this term has reliance language, which can be indicative of a valid disclaimer, *see Italian Cowboy*, 341 S.W.3d at 336, it is expressly limited to representations about past and future performance. As the bankruptcy court found, this case "is not about past or future performance of JPG"; it is about intentional misrepresentations of existing facts regarding land ownership and costs.

The second clause is a limitation of liability clause: "The contents of the Memorandum have not been independently verified by the Company's Advisors or the Company, and any of their respective affiliates, employees, or representatives expressly disclaims any and all liability relating to or resulting from the use of this Memorandum, or such other information as may be provided, whether communicated in oral or written form, to a potential investor or any of its affiliates or representatives." This clause has neither reliance language nor reference to specific representations, so it is not sufficiently specific to bar Plaintiffs' reliance on Defendants' representations. *See Sysco Merch. & Supply Chain Servs., Inc. v. Remcoda, LLC*, No. 4:22-CV-02075, 2023 WL 1781810, at *7 (S.D. Tex. Feb. 6, 2023) ("This Court has located no case postdating *Italian Cowboy* in which either the Texas Supreme Court or Fifth Circuit has held that a party disclaimed reliance absent a contract that used the term 'rely' or 'reliance.'").

The third clause outlines the inherent risk in investments. It provides, "The recipient expressly understands and agrees that any estimates, projections and assumptions are uncertain and accordingly, no representation can be made as to their attainability." Through this language, Plaintiffs simply acknowledged the risk present in any investment: a company can never be certain of any future success. *See Carlton Energy Grp., LLC v.*

*Phillips*, 369 S.W.3d 433, 454 (Tex. App.—Hous. [1st Dist.] 2012) ("Of course, any investment of capital made to obtain an interest in a speculative venture involves risk, especially if the decision to make the investment can be made on nothing more than estimates."), *aff'd in part, rev'd in part on other grounds*, 475 S.W.3d 265 (Tex. 2015). While this provision may have released Defendants from a hypothetical failed investment claim, that is not the claim before this court. This litigation concerns Defendants' fraudulent conduct both before and after Plaintiffs' investment, not the success of the Project.

Finally, the fourth clause provides, "Only those representations and warranties made in a definitive, written purchase agreement, and subject to such limitations and restrictions as may be specified therein, shall have any legal effect." Although, on its face, this clause comes the closest to a disclaimer of reliance, it still falls short. Initially, as mentioned above, it appears to render the rest of the paragraph (and the PPM as a whole) meaningless by implying that no representations in the PPM have any legal effect.

A resort to traditional contract interpretation principles does not improve its efficacy as a disclaimer. *See, e.g.*, *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003) ("[W]e must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless."). To avoid rendering the PPM a nullity, we could attempt to read the third and fourth clauses together, meaning that any representations or warranties about estimates, projections, or assumptions in the PPM would not be actionable, while representations about these issues in the Investment Agreement would be. But that reading would not help Defendants either because Plaintiffs' claims do not concern future projections. Instead, the most plausible reading is the initial interpretation discussed above: When read in tandem with the

No. 25-20021

Investment Agreement, the Investment Agreement incorporates and gives legal effect to the PPM's representations.

Defendants' attempt to analogize to case law with effective disclaimers does not save them. Defendants rely on *International Business Machines Corp. v. Lufkin Industries, LLC*, 573 S.W.3d 224 (Tex. 2019). There, the Texas Supreme Court analyzed two documents—an agreement and a statement of work ("SOW"). *Id.* at 228–29. The SOW's disclaimer provision explicitly disclaimed reliance on representations "not specified in the Agreement or this SOW including, without limitation, the actual or estimated completion date, amount of hours to provide any of the Services, charges to be paid, or the results of any of the Services to be provided under this SOW." *Id.* at 228 (footnote omitted). The Texas Supreme Court found that this provision, in tandem with a merger cause itself including a disclaimer, effectively disclaimed reliance on certain representations because it named the types of representations that were not actionable. *Id.* at 229. Thus, *IBM*'s specific language met the high bar set forth in *Italian Cowboy*. *See id.* at 229–30. By contrast, the only (arguably) specific clause is the PPM provision's third clause, but it certainly does not disclaim fraud of the kind before us.

The language of the Investment Agreement and PPM is far from a "clear and unequivocal" disclaimer of reliance on Defendants' fraudulent misrepresentations.[7] Without such a disclaimer, Plaintiffs' claims were not waived or otherwise negated, and we proceed to consider their merits.

---

[7] Because we find that no enforceable disclaimer exists, we need not consider the surrounding circumstances to determine whether a disclaimer should be binding. *See Italian Cowboy*, 341 S.W.3d at 337 n.8.

No. 25-20021

## C.

Defendants contend that Plaintiffs have failed to prove justifiable reliance—an essential element of their fraud and fraudulent inducement claims. Under Texas law, a fraud claim has six elements: a plaintiff must prove "(1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury." *Italian Cowboy*, 341 S.W.3d at 337 (quoting *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (per curiam)). A fraudulent inducement claim shares the same elements. "Fraudulent inducement is a subspecies of fraud; 'with a fraudulent inducement claim, the elements of fraud must be established as they relate to an agreement between the parties.'" *Hooks*, 457 S.W.3d at 57 (quoting *Haase v. Glazner*, 62 S.W.3d 795, 798–99 (Tex. 2001)); *see also Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018).

Defendants challenge only the justifiable reliance element of these claims, both generally and as applied to specific "red flags." To prove this element, Plaintiffs must show both (1) that they "actually relied on" Defendants' representations and (2) "that such reliance was justifiable." *Orca Assets*, 546 S.W.3d at 653. The bankruptcy court found that Plaintiffs "actually and justifiably relied on [Defendants'] representations." Justifiable reliance presents a question of fact, which we review for clear error. *Id.* at 654.

### i.

Defendants challenge Plaintiffs' demonstration of both the actual and justifiable prongs of justifiable reliance. They are wrong on both counts.

18

First, record evidence supports the bankruptcy court's finding on actual reliance. Quintero and Ramirez both testified that they believed the statements in the PPM were accurate and that the PPM's representations were important to their investment decisions. For example, Quintero said that he trusted the PPM's statement that Pastrana had already invested $7 million in the Project, and this representation was significant to Quintero because it showed him that Pastrana "had put up capital at risk to complete the project." Ramirez felt the same. He too believed Pastrana had already contributed $7 million and stated that he would not have invested on the terms he did if he had known the truth.

As to the misrepresentations about JPG's land ownership, Quintero testified that he would not have invested on the terms he did if he knew the land would not be contributed to JPG simultaneous with his investment because "that land was very important" and changed the value of the deal "completely." Without it, the project and Plaintiffs' money was "at higher risk." Similarly, Ramirez believed JPG owned the land in 2014 and clearly stated that he would not have invested if he believed JPG would not own the property until final financing of the Project. This testimony supports the bankruptcy court's finding that Plaintiffs actually relied on Defendants' false statements.

Defendants point to a single email from Quintero to argue that Plaintiffs did not rely on Defendants' misrepresentations. Quintero emailed Ramirez on August 4, 2014—before they invested—stating in part, "The intent has always been that our equity provides dollar for dollar parity to [Pastrana's] investments in the project. We have relied on the firm[']s calculations, how can we make sure they have done this correctly?" Quintero also asked the same question of his attorney, who replied that he had "seen nothing that indicates that JPG contemplates different classes of equity interests," so rights and distributions would be assigned pro rata.

Defendants contend that these emails show that Plaintiffs were satisfied with pro rata distributions and decided not to ask Focus Strategies about how it calculated Pastrana's investment. To Defendants, it follows that Plaintiffs could not have relied on the PPM's representations about Pastrana's investment because Plaintiffs did not ask Focus Strategies about the math underlying Pastrana's investment figure. We see it differently. These emails show that Plaintiffs *were* relying on Focus Strategies' calculations reflected in the PPM, which rested on Pastrana's misrepresentations, and that Plaintiffs actively engaged in ensuring the numbers were correct. Thus, we find no clear error in the bankruptcy court's finding that Plaintiffs actually relied on Defendants' misrepresentations.

Second, record evidence also supports the bankruptcy court's finding that Plaintiffs' reliance was justified. To determine whether a party meets the "justifiable" prong of the justifiable reliance element, we consider "the entirety of the circumstances," *Est. of Ewers*, 695 S.W.3d at 637, including "the nature of the relationship and the contract" between the parties, *AKB Hendrick, LP v. Musgrave Enters., Inc.*, 380 S.W.3d 221, 232 (Tex. App.—Dallas 2012, no pet.). "In an arm's-length transaction, each party must exercise reasonable diligence to protect his own interests; a party may not justifiably rely on 'mere confidence in the honesty and integrity of the other party.'" *Est. of Ewers*, 695 S.W.3d at 637 (quoting *Orca Assets*, 546 S.W.3d at 654). Reasonable diligence equates to "ordinary care for the protection" of a party's own interests. *AKB Hendrick*, 380 S.W.3d at 232.

The record shows that Plaintiffs exercised reasonable care to protect their interests. Although Plaintiffs expressed confidence in the PPM by testifying that the document appeared to be "well-prepared," "comprehensive," and "professional," Plaintiffs did not blindly rely on the assertions in the PPM. Instead, Plaintiffs engaged in nine months of due diligence, reviewed the PPM, met with Focus Strategies to walk through the

PPM, asked questions about the calculations, and engaged counsel to assist with the investment. All of these actions support the bankruptcy court's finding that Plaintiffs justifiably relied on Defendants' representations. Meanwhile, Pastrana obscured his fraudulent conduct by feeding false numbers to Focus Strategies and sharing false reports with Plaintiffs after their investment.

Plaintiffs had no obligation to investigate further—going above a standard of ordinary care—and Defendants fail to explain how additional diligence would have revealed Defendants' fraud. Thus, the bankruptcy court did not clearly err in holding that Plaintiffs justifiably relied on Defendants' representations.

ii.

Defendants separately argue that the investment documents included "red flags" that should have alerted Plaintiffs to the fraud and negated justifiable reliance as a matter of law.[8] Under Texas law, "a person may not justifiably rely on a representation if there are red flags indicating such reliance is unwarranted." *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010) (internal quotation marks omitted) (quoting *Lewis v. Bank of Am. NA*, 343 F.3d 540, 546 (5th Cir. 2003)). In considering red flags and justifiable reliance, courts consider "the circumstances in their entirety while accounting for the parties' relative levels of sophistication." *Orca Assets*, 546 S.W.3d at 656; *see also Est. of Ewers*, 695 S.W.3d at 637 ("We take into consideration a party's individual characteristics, abilities, and

---

[8] Defendants also reference federal securities cases about "storm warnings" that alert investors to fraud. Because Texas law governs this dispute and provides us with adequate answers, we do not address those cases.

appreciation of facts and circumstances at the time the representation was made." (cleaned up)).

The only "red flag" that Defendants point to is a single statement in the PPM, providing that Plaintiffs must rely on "their own independent verification of the information" in the PPM.[9] This single statement—in a 100-page document covering financial information, engineering specifics, and more—is not the type of red flag that would require Plaintiffs to go beyond the reasonable care that they exercised.

In *JP Morgan Chase Bank, N.A. v. Orca Assets*, the Texas Supreme Court held that red flags negated justifiable reliance where eight different red flags, taken together and considered in light of the parties' sophistication in oil and gas investments, precluded justifiable reliance. 546 S.W.3d at 655–58. Unlike the *Orca Assets* investors, Plaintiffs have no expertise in the oil and gas industry. Moreover, several red flags in *Orca Assets* pertained to the parties' discussions of certain relevant issues, during which the parties expressed serious doubts about them, *id.*—facts that are not present here. The court reasoned that if the investors "remained skeptical" about certain issues they had expressed concern about, they could not blindly rely on JPMorgan's representations about the issue and stop their own investigation into them. *Id.* at 657. Importantly, the court also rejected "the notion that the mere use of" two contractual provisions "could wholly negate justifiable reliance." *Id.* at 655–56. Only the evidence taken cumulatively could. *Id.*

---

[9] In their reply brief, Defendants contend for the first time that Pastrana's oral representations were contradicted by the text of the investment documents, requiring Plaintiffs to investigate further. Arguments only raised in a reply brief are improper, so we do not discuss this point in detail. *See, e.g.*, *Sanders v. Unum Life Ins. Co. of Am.*, 553 F.3d 922, 927 (5th Cir. 2008). We do note that even if we were to consider this argument, it would not change our analysis, considering the totality of the circumstances.

No. 25-20021

Considering the totality of the circumstances here, Plaintiffs were not required to investigate beyond the reasonable diligence they completed. As in *Orca Assets*, a single statement in the PPM directing Plaintiffs to verify its information is not a red flag that would demand further investigation. Looking beyond the contracts, Plaintiffs had no experience in the oil industry, while Pastrana had many years of experience leading Lub-Line. *See, e.g.*, *Est. of Ewers*, 965 S.W.3d at 639 (finding no red flags to negate justifiable reliance with a heavy focus on the parties' lack of experience investing in the oil and gas industry). Plaintiffs acted reasonably in their due diligence before the investment and their engagement with Pastrana and JPG afterwards. Thus, no red flags negate justifiable reliance.

*        *        *

Plaintiffs' reliance on Defendants' misrepresentations was justified. Defendants do not make any other substantive challenges to Plaintiffs' claims. Therefore, we affirm the rulings on the merits.

## D.

Defendants' last argument challenges the bankruptcy court's damages award. The bankruptcy court awarded Plaintiffs the full value of their investments—$1,625,000 million each—plus $536,250 each in exemplary damages. Specifically, the bankruptcy court found that Ramirez and Bestrenewedoil "each suffered injuries with $1.625 million in damages, marking the difference between the amount invested ($1.625 million) and the value received ($0)." Defendants argue that Plaintiffs are not entitled to recover the value of their investment and that there was not adequate evidence to support this award.

"Direct damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong." *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997).

"Direct damages compensate the plaintiff for the loss that is conclusively presumed to have been foreseen by the defendant from his wrongful act." *Id.* Out-of-pocket, or restitution, damages are available as direct damages for fraud and fraudulent inducement, "measured by the difference between the value expended versus the value received, thus allowing the injured party to recover based on the actual injury suffered." *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015). These damages are measured "at the time of sale." *Arthur Andersen*, 945 S.W.2d at 817. The proper amount of damages is a fact question. *Flanary v. Mills*, 150 S.W.3d 785, 793 (Tex. App.—Austin 2004, pet. denied).

First, Defendants contend that Plaintiffs are not entitled to damages under Texas law because they only suffered the typical losses associated with a risky investment. According to Defendants, Plaintiffs' losses resulted from the Project's failure to secure additional financing, not from Defendants' fraud. This argument mischaracterizes Plaintiffs' injury. Plaintiffs' losses stem from the investment itself—not from JPG's performance or the Project's failure. Defendants' argument would apply to "benefit-of-the-bargain," or expectancy, damages, which allow an injured party "to recover profits that would have been made had the bargain been performed as promised."[10] *Id.* Because this case instead arises from Defendants' deliberate misstatements to Plaintiffs, inducing their $3,250,000 million investment in a venture that did not exist as depicted in the investment

---

[10] Defendants cite *Arthur Anderson* for the premise that "holding that mere consideration of the purchase price as a stand-in for actual fraud damages is reversible error." 945 S.W.2d at 817. The *Arthur Anderson* court's holding was not so broad. There, the award was reversible because "the jury was simply asked to consider the purchase price as part of the overall damages" and "was not asked to find direct damages at the time of the sale as well as consequential damages attributable to [the] misrepresentations." *Id.* "Because the charge failed to instruct the jury on the proper measure of direct damages, the submission was reversible error." *Id.*

documents, Plaintiffs are entitled to "out-of-pocket" damages. *Zorrilla*, 469 S.W.3d at 153. The lower courts did not clearly err in computing Plaintiffs' damages.

Next, Defendants argue that Plaintiffs have not shown any competent evidence to support a damages award equal to their full investment. This argument is contradicted by Texas law. In *Siddiqui v. Fancy Bites, LLC*, the Texas Court of Appeals upheld out-of-pocket damages in the full amount of the parties' investment. 504 S.W.3d 349, 375 (Tex. App.—Hous. [14th Dist.] 2016, pet. denied). The parties testified that the venture did not own certain property—contrary to representations made to the investors—and that the value of the partnership rested on this misrepresentation about land ownership. *Id.* Relying on this testimony, the court reasoned that the venture had no value at the time of the investment: "This evidence is legally sufficient to support a finding that the 'value received' component of the out-of-pocket measure of damages was zero at the time the investments were made." *Id.*

Similarly, here, Plaintiffs' investment rested on the inaccurate assumptions that Pastrana had already invested $7 million in the Project and that JPG owned the land for the Project. Because neither was true, Plaintiffs' investment was worthless. Quintero and Ramirez both testified that the value of their investment was "zero" on the day they invested because it was based on lies about Pastrana's investment and JPG's land ownership. Ramirez clearly testified that he would not have invested in the company if he knew that JPG would not own the land until final financing. Without that land, JPG had no clear value, and Pastrana could not identify any assets JPG owned to prove otherwise. Defendants argue that Plaintiffs' testimony cannot support the damages award, but, as in *Siddiqui*, testimony showing that investments made in reliance on fraudulent statements about a venture's value can establish that the "value received" from a fraudulent investment

is zero. 504 S.W.3d at 375. The bankruptcy court and district court did not err in holding so here.

Finally, Defendants contend that the bankruptcy court erred in admitting expert testimony on damages. The bankruptcy court explicitly stated that it would allow Plaintiffs' expert, an accountant named Richard Jones, to testify as to damages to build a record but would ignore his opinions on damages because in a bench trial, the court did not need expert testimony on that issue. There is no indication that the bankruptcy court or the district court relied on Jones's testimony regarding damages, and we do not look to Jones's testimony on damages either. Thus, there was no reversible error in the bankruptcy court allowing Jones to testify where it did not rely on his opinions.

Defendants have failed to establish reversible error in Plaintiffs' damages award, so we uphold the damages awarded by the bankruptcy court and affirmed by the district court.[11]

## IV.

We are the fourth court to consider this case, and Defendants have not established a reason for us to deviate from the course charted by the three courts that addressed it before us. For the foregoing reasons, we AFFIRM.

---

[11] Defendants do not make any specific arguments about exemplary damages. Rather, they contend that without a valid award of actual damages, the exemplary damages award is "likewise erroneous." Because we uphold the actual damages award, we find no error in the award of exemplary damages.